## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JACQUELINE MILLAN,** | : | **CIVIL CASE NO.:** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **American International Group, Inc.,** | : | |
| **and AIG Financial Products,** | : | |
| **Defendants.** | : | |
| | : | **February 16, 2010** |

### COMPLAINT

### INTRODUCTION

1.      This is an action arising out of illegal actions by senior executives at

Defendant American International Group, Inc., and at one of its subsidiaries, AIG

Financial Products.  While working as a compliance associate for AIG Financial

Products, Plaintiff identified irregularities in the trading of AIG stock by a highly-placed

senior executive, Ronald Latz.  After bringing these irregularities to the attention of her

supervisor, Loreto Fuentes, and through her to AIG's in-house counsel, William Shirley,

and Corporate Compliance, Plaintiff found herself shut out of the investigation and

subjected to intimidation on several occasions by Mr. Latz.  Shortly thereafter her

employment was terminated.  Plaintiff now brings this action for wrongful termination

and retaliation under The Sarbanes-Oxley Act (hereinafter "SOX" or the "Act"), codified

at 18 U.S.C. § 1514A, and Connecticut General Statutes § 31-51q .

## THE PARTIES

2.      Plaintiff, Jacqueline Millan ("Plaintiff"), is an individual with a residence in Norwalk, Connecticut.

3.      Defendant AIG Financial Products Corp. ("AIG-FP") is a Delaware corporation whose principal place of business is 50 Danbury Road, Wilton, Connecticut. Defendant AIG-FP is a subsidiary of Defendant American International Group, Inc. ("AIG").  Defendant AIG-FP is an agent of Defendant AIG within the meaning of 18 U.S.C. § 1514A(a).  In addition, Defendant AIG-FP and Defendant AIG constitute an integrated employer.  Defendant AIG-FP was Plaintiff's employer, and is subject to the provisions of 18 U.S.C. § 1514A and Conn. Gen. Stat. § 31-51q.  Defendant AIG-FP is an employer within the meaning of Conn. Gen. Stat. § 31-51q.

4.      Defendant AIG is a Delaware corporation with headquarters located at 70 Pine Street, New York, New York.  Defendant AIG's stock is publicly traded on the New York Stock Exchange.  Defendant AIG is a company with a class of securities registered under Section 12 of the Securities Exchange Act of  1934 (15 U.S.C. 781), or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.s.c. § 780(d).  Defendant AIG was Plaintiff's employer, and is subject to the provisions of 18 U.S.C. § 1514A and Conn. Gen. Stat. § 31-51q.  Defendant AIG-FP and Defendant AIG constitute an integrated employer.  Defendant AIG is an employer within the meaning of Conn. Gen. Stat. § 31-51q.

## JURISDICTION

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S. C. § 1331 because it presents a federal question under 18 U.S.C. § 1514A and

Conn. Gen. Stat. § 31-51q.  This Court has supplemental jurisdiction over Plaintiff's

State Law claims pursuant to 28 U.S.C. § 1367.

     5.      Plaintiff has satisfied all procedural and administrative requirements under

18 U.S.C. § 1514A, as Plaintiff previously filed a complaint with the U.S. Department of

Labor, OSHA ("OSHA"), and notified OSHA of her intent to file this action more than 15

days ago and after her complaint had been pending for more than 180 days.

     6.      Plaintiff filed her complaint with OSHA on February 11, 2009.  Defendants

filed a Position Statement and supporting documents with OSHA on March 23, 2009.

An OSHA Investigator reviewed the filings by Plaintiff and Defendants, and interviewed

witnesses.  Plaintiff filed a rebuttal on August 13, 2009, to which Defendants responded

on August 28, 2009.  On October 5, 2009, the Plaintiff's complaint was dismissed by

OSHA.  On November 6, 2009, Plaintiff filed Objections and Request for Hearing *De*

*Novo*.  A hearing *de novo* was granted and the matter referred to the Office of

Administrative Law Judges in November 2009.

     7.      On July 14, 2010, Plaintiff notified Judge Calianos that she intended to

pursue her claims under the Sarbanes Oxley Act of 2002, 18 U.S.C. § 1514A in court,

since her claims had been pending for more than 180 days and no final decision had

been issued.

     8.      Accordingly, on July 16, 2010, Judge Calianos issued an order dismissing

the Plaintiff's complaint without prejudice, acknowledging that the complaint was filed on

February 11, 2009 and over 180 days had expired by the time the matter was referred

to the Office of Administrative Law Judges in November 2009.  The order further states

that "there is nothing in the record to suggest that any of the delay is attributable to bad

faith on the part of the Complainant.  Accordingly, the Complainant has a right to file an action in U.S. District Court."

## BACKGROUND

9.      Plaintiff began working as a Compliance Associate in AIG-FP's Compliance Department on May 21, 2007.  At the time of her hiring, Plaintiff's direct supervisor was Samantha Addonizio ("Ms. Addonizio"), Chief Compliance Officer. Plaintiff also reported to William Shirley ("Mr. Shirley"), General Counsel of AIG-FP, and Hartmut Grossman ("Mr. Grossman"), Head of Compliance of the Financial Services Division of AIG.

10.      At the time Plaintiff was hired, William Dooley ("Mr. Dooley") was a Senior Vice President of Financial Services, eventually becoming Chief Executive Officer for AIG-FP upon the departure of Joseph Cassano in early 2008.

11.      Shortly after Plaintiff began working in AIG-FP's Compliance Department, Ms. Addonizio went on maternity leave and subsequently left the employ of AIG-FP. Loreto P. Fuentes ("Ms. Fuentes") was hired to replace her, and became Plaintiff's immediate supervisor in December 2007.

12.      Plaintiff's duties as a Compliance Associate included, *inter alia*, reviewing employee stock trade confirmations and monthly brokerage statements pursuant to firm policy, FINRA and SEC regulations, among other required compliance duties.  Plaintiff was responsible for reporting any suspicious activity ("red flags") regarding brokerage trades to Ms. Fuentes, including but not limited to restricted and/or watch list stocks or investments, or ad hoc requests for certain associated employees.  Also as part of her

duties, Plaintiff reviewed confidential employee correspondence and e-mail for suspicious activity.

13.     Throughout her tenure, Plaintiff performed her job competently and diligently.  Plaintiff's abilities and contributions were acknowledged several times by Mr. Shirley, including an increase in her salary at year end 2007, as well as a significant increase in her 2008 bonus signed by Mr. Dooley in July 2008, to be paid at year end 2008.

14.     On or about September 15, 2008, during her trade review, Plaintiff noted that certain employees executed AIG stock trades ("AIG Stock Trades").  Although she had not been asked to review for employee AIG Stock Trades, due to the timing of the AIG Stock Trades, which occurred during a period of time when AIG was considering filing for bankruptcy, and the possibility of a violation of insider trader rules and regulations, Plaintiff notified Ms. Fuentes of the AIG Stock Trades.  Ms. Fuentes in turn reported Plaintiff's findings to Mr. Grossman, and then to Mr. Shirley.

15.     Following the identification of the AIG Stock Trades, a labor-intensive internal review of months' worth of emails and bank records of the employees who conducted the AIG Stock Trades was made to determine whether any wrongdoing or insider trading violations had occurred.  This internal review of emails was spearheaded by Ms. Fuentes and Mr. Grossman, with Plaintiff's assistance.

16.     As part of this internal review, Ms. Fuentes requested that Plaintiff review the emails of several employees, including the emails of Ronald A. Latz ("Mr. Latz"). Mr. Latz was the former CFO of AIG's Financial Services Division and was known to be

close friends with Mr. Dooley and Mr. Shirley.  At the time of the review of the AIG Stock Trades, Mr. Latz held a position in Middle Office at AIG-FP and was a Vice President.

17.     Upon information and belief, Mr. Latz was removed from his prior position as CFO of AIG's Financial Services Division due to his involvement with issues relating to the PNC Bank, which led to an SEC investigation and his eventual demotion to AIG-FP.  At that time, Mr. Latz had been with AIG for over 20 years.

18.     Upon reviewing Mr. Latz's emails, Plaintiff discovered that he was in possession of a great deal of privileged information known only to company insiders, including accounting models, information shared at AIG-FP's senior management meetings, and the Federal Reserve's involvement with attempts to bail out AIG.

19.     Plaintiff reported Mr. Latz's possession of this information to Ms. Fuentes, Mr. Grossman and an associate of Mr. Grossman's, Anna Rukaj.  Initially, Ms. Fuentes and Mr. Grossman seemed very interested in Plaintiff's findings; two meetings were conducted to review the supporting email documentation in or around late September, early October of 2008.

20.     A meeting was set up with Mr. Latz for October 7, 2008.  Prior to that meeting taking place, Ms. Fuentes asked Plaintiff to review her findings regarding Mr. Latz with Mr. Shirley.

21.     When Plaintiff attempted to speak with Mr. Shirley about Mr. Latz's involvement in the AIG Stock Trades and the email documentation regarding those trades, Mr. Shirley was very short with Plaintiff, telling her to have Ms. Fuentes deal with "that situation" as he had not started it.  Mr. Shirley appeared angry, and thereafter fully distanced himself from matters involving the AIG Stock Trades.

22.     Shortly thereafter, Ms. Fuentes informed Plaintiff that the matter had been outsourced to outside counsel because it had been determined that a number of AIG employees from other subsidiaries had also possibly traded AIG stock while in possession of insider information during a sensitive time in the AIG bailout period and without prior approval.

23.     Plaintiff was never consulted by outside counsel with regard to the AIG Stock Trades or the email documentation review she performed earlier.  Although she asked several times about the investigation, she was never provided with any details on what the investigation entailed or what the results of the investigation were.

24.     Approximately two to three weeks later, Plaintiff requested leave beginning on October 24, 2008, in order to meet up with her mother and other family members in Mexico to inter her brother's ashes.

25.     Shortly thereafter, Plaintiff was granted a five-day leave of absence, with three days paid as bereavement leave, and the other two days designated as unpaid leave time.

26.     While in Mexico, Plaintiff attempted to contact the airport to switch her return flights to Sunday, November 2, 2008 by flying standby on that date.

27.     On Sunday, November 2, 2008, while attempting to get to the Zacatecas airport, Plaintiff was delayed by a military roadblock, resulting in her missing the flights out of Zacatecas to Mexico City that day.  Plaintiff called and left voicemails for Ms. Fuentes explaining that she had missed her flight on Sunday, and would not be able to fly home until Monday, November 3, 2008, and that she would try to come into the office

on the afternoon of November 3rd.  Plaintiff then took the flights on November 3, 2008, but did not arrive home until late that day.

30.      On Tuesday, November 4, 2008, Plaintiff returned to the office, and explained to both Ms. Fuentes and Mr. Shirley what had occurred, and the mix-up regarding the return flights.

31.      Plaintiff worked without incident for several days upon her return to work.

32.      On November 7, 2008, Plaintiff was called into a meeting with Ms. Fuentes, Mr. Shirley and Kathleen Furlong ("Ms. Furlong"), a representative from AIG-FP's Human Resources Department.  Plaintiff was confronted with a copy of her itinerary and accused of deliberately lying about her plans to return to the office on November 3, 2008.

33.      During the November 7th meeting, Ms. Fuentes claimed that the only reason she looked at Plaintiff's travel itinerary was because she had been told by another employee (later identified as Ofelia Jiminez, a kitchen worker) that Plaintiff never planned on returning to work on November 3, 2008.  During an OSHA investigation held later, Ms. Jiminez denied, under oath, that she had any knowledge regarding Plaintiff's date of return to work, or that she had any actual conversation with Ms. Fuentes regarding Plaintiff's date of return to work.

34.      Upon information and belief, Ms. Fuentes' sole reason for looking through Plaintiff's email was to find a pretext for terminating her employment.

35.      At the end of the meeting, Plaintiff was placed on paid administrative leave and told that the matter would be reviewed.  Mr. Shirley then told Plaintiff that under no

circumstances was she to contact, e-mail, or call anyone at AIG-FP until they contacted her directly.

36.     On November 13, 2008, while still on paid administrative leave, Plaintiff was informed in a telephone conversation with Mr. Shirley and Ms. Furlong that her employment was being terminated as of November 14, 2008, due to her "intentional dishonesty."  Plaintiff was also told that this information would be reported on her U5. Plaintiff was also told that since she was being terminated for cause, she would not receive the 2008 or 2009 Guaranteed Retention Award due her under the 2008 Employee Retention Plan, the equivalent of approximately $80,000.


**COUNT ONE:**       **RETALIATION IN VIOLATION OF THE SARBANES OXLEY ACT, 18 U.S.C. § 1514a**

37.     Upon information and belief, Plaintiff's firing was due to the fact that she had identified a blatant compliance irregularity and had pursued this issue repeatedly. The reason given for her termination was false and pretextual, and as such Defendants illegally retaliated against Plaintiff for her protected conduct in violation of 18 U.S.C. § 1514A.

38.     In identifying and investigating the AIG Stock Trades made by Mr. Latz, Plaintiff was reporting activities which she believed were in violation of federal law and regulations.  Plaintiff reported these activities to her direct supervisor and to AIG-FP's in-house counsel as well as AIG's Corporate Compliance Department.

39.     Plaintiff provided information, caused information to be provided, or otherwise assisted in an investigation regarding conduct which she reasonably believed constituted a violation of a law, rule, or regulation covered by 18 U.S.C. § 1514A(a)(1),

9

and provided such information or assistance to persons employed by Defendants with supervisory authority over Plaintiff and persons employed by Defendants who had the authority to investigate, discover, or terminate misconduct.

39.    Defendants had knowledge of Plaintiff's protected conduct, and Defendants suspended and discharged Plaintiff because she engaged in the aforementioned protected conduct.

40.    Defendants' actions in so suspending and discharging Plaintiff have caused her to suffer damages including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, interference with future employment, emotional and physical distress, as well as loss of enjoyment of life and loss of enjoyment of profession.

41.    Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.


**COUNT TWO:**     **VIOLATION OF CONNECTICUT GENERAL STATUTES SECTION 31-51q**

42.    Based on the foregoing, Defendants illegally retaliated against Plaintiff because she engaged in activity protected by Conn. Gen. Stat. § 31-51q.

43.    In identifying and investigating possible insider trading violations, Plaintiff engaged in speech touching upon matters of public concern, as protected by the first amendment to the United States Constitution or sections 3, 4, or 14 of article first of the Constitution of Connecticut.

44.    Defendants violated Conn. Gen. Stat. § 31-51q when they subjected Plaintiff to discipline on account of her exercise of her rights guaranteed by the first

Case 3:11-cv-00260-RNC   Document 1   Filed 02/16/11   Page 11 of 13


amendment to the United States Constitution or sections 3, 4, or 14 of article first of the Constitution of Connecticut.

45.     Defendants had knowledge of Plaintiff's protected conduct.

46.     Defendants retaliated against Plaintiff because of her protected conduct.

47.     There is a causal connection between Plaintiff's protected conduct and Defendants' retaliation against her.

48.     Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, emotional and physical distress, as well as loss of enjoyment of life and loss of enjoyment of profession.

49.     Defendants exhibited a reckless indifference to Plaintiff's rights, or an intentional and wanton violation of Plaintiff's rights, thereby entitling Plaintiff to an award of punitive damages.

50.     Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.


**COUNT THREE:     DEFAMATION**

51.     At the time that Defendants terminated Plaintiff's employment, Defendants filed a U5 Uniform Termination Notice for the U.S.Securities Industry through the Central Registration Depository (CRD) operated by FINRA, dated November 17, 2008 (the "U5 Notice") with the SEC stating that Plaintiff had been terminated for "intentional misrepresentation about absence from office."

52.     Because Defendants' claim that Plaintiff was terminated for "intentional misrepresentation," Plaintiff is unable to renew her licenses with the SEC, or secure comparable employment in the financial services industry.

53.     Upon information and belief, Defendants' statement on the U5 Notice was false, misleading and defamatory.

54.     Defendants' filing of the U5 Notice represents publication of defamatory statement to persons other than Plaintiff.

55.     Defendants' filing of the U5 Notice was intentional and willful, and done with wanton disregard of any harm it might cause to Plaintiff.

56.     Plaintiff has been harmed by Defendants' defamatory statement which prevents her from renewing her licenses with the SEC or securing comparable employment in the financial services industry.

57.     Due to Defendants' intentional, willful and wanton conduct, Plaintiff has suffered damages, including loss of compensation, loss of enjoyment of her profession, and loss of the ability to continue in her profession.

58.     Also due to Defendants' intentional, willful and wanton conduct, Plaintiff has incurred, and continues to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff claims a TRIAL BY JURY, and the following damages:

1.     Compensatory damages, including but not limited to, lost wages, lost benefits, depletion of personal savings, emotional distress, humiliation, loss of enjoyment of life and loss of enjoyment of profession;

2.      Back pay;

3.      Reinstatement, or front pay;

4.      Statutory punitive damages pursuant to Conn. Gen. Stat. § 31-51q, and

common law punitive damages;

5.       Attorneys' fees and costs pursuant to Conn. Gen. § 31-51q;

6.      Such other relief in equity or law that may pertain.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

PLAINTIFF,
JACQUELINE MILLAN

By: _____
Peter B. Prestley, Esq. (ct15799)
Madsen, Prestley & Parenteau, LLC
44 Capitol Ave., Suite 201
Hartford, CT 06106
Tel: (860) 246-2466   Fax: (860) 246-1794
Attorney for the Plaintiff
pbprestley@mppjustice.com